UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

STEVEN L. ANDERS,

        Plaintiff,

      v.                                    Case No. 03-C-483

WASTE MANAGEMENT OF
WISCONSIN, INC., subsidiary, and
WASTE MANAGEMENT, INC.,
parent corporation,

        Defendants.

_____

## O R D E R

      Plaintiff Steven Anders filed this action against defendants Waste Management of Wisconsin, Inc. and Waste Management, Inc. ("Waste Management"), his former employer, alleging Waste Management terminated his employment and refused to rehire him because he is black, terminated his employment because he is disabled, denied him medical leave guaranteed by the Family Medical Leave Act, and retaliated against him for filing a charge with the Equal Employment Opportunity Commission. Waste Management has moved for summary judgment pursuant to Fed. R. Civ. P. 56(c). The matter is fully briefed, and for the reasons that follow, the court will grant Waste Management's motion.

In the Eastern District of Wisconsin, litigants are required to adhere to Civil Local Rule 56.2 (E.D. Wis.). Rule 56.2 requires the movant to set forth proposed findings of fact supported by citations to the record, and it requires the non-movant to set forth a specific response to the movant's proposed findings of fact. The relevant portion of the rule reads as follows:

> Motions for summary judgment must comply with Fed. R. Civ. P. 56 and Civil L.R. 7.1. In addition, with the exception of Social Security reviews and cases in which a party appears pro se, the following requirements *must* be met:
>
> (a)    Motion. The moving papers must include either (1) a stipulation of facts between the parties, or (2) the movant's proposed findings of fact supported by specific citations to evidentiary materials in the record (e.g., pleadings, affidavits, depositions, interrogatory answers, or admissions), or (3) a combination of (1) and (2).
>
>     (1)    The movant must present only the factual propositions upon which there is no genuine issue of material fact and which entitle the movant to judgment as a matter of law, including those going to jurisdiction and venue, to the identity of the parties, and to the background of the dispute.
>
>     (2)    Factual propositions must be set out in numbered paragraphs, with the contents of each paragraph limited as far as practicable to a single factual proposition.
>
> (b)    Response. Any material in opposition to a motion filed under this rule must be filed within 30 days from service of the motion and must include:
>
>     (1)    A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and

> must include specific citations to evidentiary
> materials in the record which support the claim
> that a dispute exists.

Civ. L.R. 56.2 (E.D. Wis.) (emphasis added). In this case, Waste Management

set forth 65 (sixty-five) proposed findings of fact–each in numbered paragraphs,

limited to a single proposition, and accompanied by citations to the record. In

response, Anders submitted a document which contained no specific responses to

Waste Management's proposed findings of fact, in no way clearly delineated only

those findings in which genuine issues of material fact existed, and did not refer

to a single contested finding by paragraph number. On the whole, Anders'

response is a disjointed, convoluted, and hopeless mess; his non-compliance with

Rule 56.2(b) is more than substantial–it is *total*. Under these circumstances, the

court is obliged to disregard Anders' response and deem the proposed findings of

fact submitted by Waste Management as undisputed for purposes of this motion.

*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("We have . . .

repeatedly upheld the strict enforcement of [local rules regarding summary

judgment obligations], sustaining the entry of summary judgment when the non-

movant has failed to submit a factual statement in the form called for by the

pertinent rule and thereby conceded the movant's version of the facts."); *Salvadori

v. Franklin Sch. Dist.*, 293 F.3d 989, 992 (7th Cir. 2002) (plaintiff's response to

defendant's detailed findings of fact fails to contradict the specific proposed

findings, does not comport with Local Rule 56.2, and accordingly, defendant's proposed findings are properly adopted by the court under such circumstances).

Here are the material facts: Anders, a self-described large African-American male, was employed by Waste Management as a roll-off driver at its Franklin, Wisconsin location. (Defendant's Proposed Finding of Fact ("DPFOF" ¶ 52; Answer ¶ 12.) During the course of Anders' employment, Waste Management had rules prohibiting fighting, assaulting, or otherwise endangering employees in the workplace as well as rules prohibiting the failure to perform work assignments. (DPFOF ¶ 7; Anders Dep. at 158-59, 170; Anders Dep. Ex. 2.) Anders understood if he broke these rules he would face consequences, including termination. (DPFOF ¶¶ 8, 9; Anders Dep. at 159, 170.)

Waste Management terminated Anders' employment on or about November 13, 2002. (DPFOF ¶ 37.) Dennis Drephal, the regional manager for Waste Management, made the ultimate decision to terminate Anders after conducting an investigation into reports that he engaged in workplace violence and failed to perform his job assignment. (DPFOF ¶¶ 3, 37.) Drephal testified he terminated Anders principally because he had been violent in the workplace on November 12, 2002, and caused a supervisor, Bill Snow, to feel unsafe around him. (*Id.* at 29-30, 38-39.) Drephal testified he also terminated Anders because

Anders failed to perform his job assignment on the morning of November 12, 2002.  (*Id.* at 39-40, 43.)

Prior to his decision to terminate Anders, Drephal reviewed written reports prepared by several supervisors recounting how Anders engaged in violent and insubordinate behavior.  (DPFOF ¶¶ 37 through 40.)  Snow's report recounted how Anders engaged in insubordinate behavior and made a threatening comment on October 24, 2002:

> The latest incident with Mr. Anders started on October 24, 2002 when Steve was given a letter for violating our attendance policy. After Dave Koch our Roll off Route Manager gave Steve the letter he took his jacket off and threw it on the floor and started screaming why should he receive a letter for being one or two minutes late. Steve demanded all of his records for the year.  On November 6[th] when Steve came into the yard I requested to see Steve so I could ask him if he understood the attendance policy and see if there was anything else bothering him.  In our discussion Steve explained to me that we were taking two dollars an hour from him because we were 'taking his stops away' from him. He explained that he no longer had the city of Kenosha and Chrysler as a permanent stop.  I explained that we had to dispatch loads productivity [*sic*] while balancing our flexibility in getting more of our drivers familiar with all of our stops. Steve continued to tell me that we are not treating drivers correctly and that he was thinking of quitting.  He also told me that if 'things do not start changing around here someone is going to go off and hurt someone.'   After about 40 minutes of listening to Steve and explaining our business reasons for change I thought that we had come to a consensus on the issue.  However, at the very end of our discussion, Steve started to get excited and brought up issues that I had thought we covered thoroughly.  I assured Steve that I would watch closely how our loads were being dispatched and reinforce him

-5-

he would still be involved in hauling the city of Kenosha and Chrysler but not extensively.

(DPFOF ¶ 5; Anders Dep. Ex. 18.)  Snow prepared another report recounting how Anders engaged in violent behavior and made an aggressive move toward him on November 12, 2002:

On Tuesday November 12, 2002, I arrived at the north side shortly after 7 a.m. when Bud Schiller informed me that Steve Anders was present and wanted to talk to Dennis Drephal regarding some issues that he was having at his assigned site in Franklin.  Bud contacted Mr. Drephal who instructed him to have me speak with Steve and see if I can help him.. [*sic*] Bud told me that Steve was in the lunchroom. When we started walking back towards the lunchroom the dispatchers informed us that Steve was lying on his car.  Bud went out to get Steve and bring him in to the building.  After a few minutes when Bud did not return Sam Philips and I walked out to the parking lot and observed Steve pounding his fists into his car and then he took his cell phone and smashed it into the ground.  At this point Sam and I were approximately 50 feet from his car as Bud tried to calm him down.  Steve was sobbing and he continued to scream about 'how unfair it was'.  After a few minutes of uncontrollable sobbing Steve put his hands on his knees and started to gasp for air. At this point I went into dispatch and had them call 911. Approximately five minutes later Bud informed Sam and I that Steve was in control of his breathing and that he was ready to talk to us. Sam and I approached Steve and asked if he was o.k.  We started walking toward the building when Steve kept leering at me and started walking in my path as he put his shoulder down and his fists together as it appeared that he was going to attack me.  As Steve got right next to me I put out my hand and told him not to come after me.  At the same [*sic*] I was speaking Bud pulled him away and steered him toward the building.  Bud put him in Sam's office until the paramedics arrived.

-6-

(DPFOF ¶ 30; Anders Dep. Ex. 19.)

Dave Koch and John Pena, both supervisors at the Franklin location, prepared a joint written report recounting how Anders was insubordinate on October 24, 2002:

> This letter is in regards to Steve Anders and his actions on October 24, 2002 when I gave him a letter in regards to his attendance.
>
> When Steve took the letter and read it he went into an outburst and was telling in the dispatch office that he wanted to see his attendance for the whole year and wanted to see it now. I tried to explain to him that we gave everyone a fresh start and started tracking the attendance from June 1, 2002 and that the letter he was receiving was from that date to now, he took his jacket off and started yelling about his attendance and that it was incorrect. I went to my computer and went into Kronos and showed him his attendance for the year and also showed him each day he was late for work and called in sick, and the days the letter referred to. At that point Steve started yelling about being late one or two minutes and that it should not count towards his attendance.
>
> John Pena tried to explain to Steve that late is anytime after your start time and Steve didn't want to listen, he was yelling that he wanted to talk to Bill Snow right now. I told Steve that Bill was not here and he went on to say that he would take this up with Mr. Snow. Steve signed the letter and left.

(DPFOF ¶ 5, Anders Dep. Ex. 20.) Sam Phillips, a supervisor at the north side location, prepared a report recounting how Anders was violent on November 12, 2002:

-7-

On Tuesday morning I arrived at work approximately 7:00 A.M. I was informed at that time that Steve Anders was here to see Dennis Drephal. Bill Snow arrived shortly after I did and asked if Steve Anders was here. We were informed by Bud Schiller that he was outside in the parking lot. Bud went outside to get Steve Anders to bring him in so Bill Snow could talk to him. Bud did not return for awhile so Bill and I went outside to see what was taking him so long. It appeared that Steve was in some type of physical distress. Bud started to escort Steve towards the door and when he neared Bill and I Steve made a move towards Bill with aggression. Bud was standing between Steve and Bill preventing any physical confrontation. Bill backed away as Steve lurched towards him and made the comment don't come after me. Bud had dispatch call 911 for Steve because he was complaining of chest pains. The ambulance arrived and transported Steve to St. Josephs Hospital.

(DPFOF ¶ 33, Anders Dep. Ex. 21.) John "Bud" Schiller's report recounted how

Anders was violent on November 12, 2002:

On 11-12-2002 Yancy Morin called and said Steve Anders was on the way to the north side to see Dennis Drephal that [*sic*] he was upset with the loads. Around 6:40 AM I went outside and Mr. Anders was here. He did not appear to be very upset at the time. I informed him that Dennis would be here around 7:30 AM. Steve informed me that he was unhappy with the loads, his supervisors Dave Koch and Bill Snow. Then I asked him to wait in the breakroom until Dennis arrived. At 7:05 AM I called Dennis to inform him that Steve was waiting to see him. Dennis informed me that he was on his way to the Metro Landfill. At this time, Bill Snow arrived and I informed him that Steve was in the breakroom. I then looked out the window and saw Steve bent over on the trunk of his car. At that time, Steve was 'mad as hell' and very upset, Sam Philips and Bill Snow accompanied me outside to see how he was doing. Bill Snow requested us to call 911 as it seemed like a medical problem. Sam also came over to see if Steve needed help, we got him calmed down enough to walk into the building. While walking, Steve saw Bill

-8-

Snow and became very violent and appeared to want to go after him. I got between Steve and Bill, Bill asked Steve if he was coming after him. Steve did not say a word to him. I pushed Steve away from Bill and accompanied him into the building where we waited in Sam Philip's office until the paramedics arrived.

(DPFOF ¶¶ 31, 32; Anders Dep. Ex. 22.)  John Pena prepared a second report recounting how Anders left the Franklin location on the morning of November 12, 2002, without performing his job assignment and without permission:

On Tuesday November 12, 2002, I handed Steve Anders his roll off tickets. He looked at the tickets and asked, "Who had Chrysler"; I told him that Aaron had them. He said "okay" and walked away. About 5-10 minutes later he came back up to the counter and put the tickets down and said he was going home. Before I could get up and talk to him he was gone. I could not ask or tell him to stop because I could not talk due to losing my voice on Monday morning. Then Bob O'Brien came up to me and said that Steve said he was going up to get Dennis Drephal and then he was coming down to get Dave. At that point I had Yancy call up the North side and to Dennis to be on the look out for him.

(DPFOF ¶¶ 12, 20, 22; Anders Dep. Ex. 17.)

Drephal also personally spoke with these supervisors prior to making the decision to terminate Anders' employment.  (Drephal Dep. at 19.)  Drephal testified Pena told him that on the morning of November 12, 2002, Anders was irritated, "not very cooperative" and said something like he was not going to do the routes assigned and was instead going to the north side to see Drephal. (Drephal Dep. at 19.)  Drephal testified Schiller, Snow, and Phillips all told him

-9-

"essentially . . . that [Anders] clenched his fists, lowered his shoulder, [and] lurched towards [Snow]" on November 12. (Drephal Dep. at 30-31.) Drephal testified Snow told him he felt threatened by Anders after the November 12 incident, and he testified Snow told him he did not feel comfortable around Anders because he could be a violent person. (Drephal Dep. at 30.)

Prior to making the decision to terminate Anders, Drephal received reports from two other supervisors at Waste Management recounting how Anders had been violent on other occasions. Drephal testified Tom Dixon, a supervisor at a landfill, told him Anders had an altercation with a landfill employee. (Drephal Dep. at 34, 36-37.) Drephal testified Brian Scholomann, a maintenance manager at the hauling company, told him about an instance where Anders engaged in an act of aggression or violence. (Drephal Dep. at 35-37.)

Drephal did not interview Anders prior to making the decision to terminate his employment. Drephal testified he did not interview Anders chiefly because he had no tolerance for the fact that Snow no longer felt safe around Anders and also because the information he received from the supervisors was "pretty well . . . consistent." (Drephal Dep. at 54-55.) Although Anders disputes he ever engaged in violent behavior in the workplace or ever refused to perform his work

assignment on November 12, 2002, Anders does not contend he relayed his side of the story to Drephal prior to his termination.

In November 2002, but after his termination, Anders filed a charge against Waste Management with the Equal Employment Opportunity Commission ("EEOC") alleging his employment was terminated because he is black. Roughly six months later, Waste Management acquired the assets of City Wide Disposal ("CWD"), a competitor Anders worked for at the time of the acquisition. (DPFOF ¶ 48.) Drephal refused to rehire Anders for the same reasons he found it necessary to terminate Anders' employment in November 2002. (DPFOF ¶ 49.)

Anders testified he has a disability in the form of a "panic, anxiety, depression" disorder. (DPFOF ¶ 53.) Anders contends he was diagnosed and treated for this disorder after the November 12 incident. (DPFOF ¶ 53.) Anders contends Drephal told him at a union grievance meeting a few days after his termination that his continued employment with Waste Management posed a liability to the company because he might "do some road rage or go irate on a customer or something like that." (DPFOF ¶ 55; Anders Dep. at 320-321.)

Anders testified he asked Bill Snow for medical leave under the FMLA during a meeting on November 6, 2002, and was told he could not have such

-11-

leave. Anders testified he was not advised by a physician that he needed a medical leave of absence from work for any medical reason as of that date, and he concedes he did not provide Snow with any medical documentation to support his request. (DPFOF ¶ 45; Anders Dep. 368-69) Anders testified he told Snow he needed time off to see a doctor because he was having migraines, was shaking, and was feeling nervous, and was crying all the time. (Anders Dep. at 100, 367-69.) Anders testified he used the words "family medical leave act" during the conversation. (Anders Dep. at 367.) Anders testified Snow told him he could not have a leave of absence under the FMLA. (Anders Dep. at 369.) Anders testified other than talking with Snow on November 6, 2002, he did nothing to obtain FMLA leave from Waste Management. (Anders Dep. at 148-51; 365-66.) Article 11 of the labor agreement governing Anders' employment stated "[a]ny employee desiring leave of absence from his employment shall secure written permission from both the Union and the Employer." (Ex. 23 at 11.) Anders never sought or obtained permission from his union to take a leave of absence. (DPFOF ¶ 44; Anders Dep. at 371-72.)

-12-

## JURISDICTION, VENUE, AND
## STANDARD OF REVIEW

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367(a). Venue is proper in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391. The court may grant summary judgment "if the pleadings, deposition, answers to interrogatories, and admission on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of a factual dispute does not defeat a summary judgment motion; rather, the requirement is that there be a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine when the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* A party opposing a summary judgment motion "may not rest upon mere allegations or denials," but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). In evaluating a motion for summary judgment, a court is ". . . not required to draw every conceivable inference from the record–only those that are reasonable." *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991).

-13-

# DISCUSSION

Anders claims Waste Management terminated his employment and refused to rehire him after the CWD acquisition because he is black, all in violation of Title VII and § 1981 of the Wisconsin Fair Employment Act ("WFEA"). Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail in a Title VII action at the summary judgment stage, a plaintiff must establish a *prima facie* case of discrimination. *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799, 806 (7th Cir. 1999). If a plaintiff establishes a *prima facie* case, the burden of proof shifts and the employer must proffer a legitimate, non-discriminatory reason for its employment decision. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002). If the employer proffers a legitimate, non-discriminatory reason for its decision, the burden shifts back and the plaintiff must show the reason proffered by the employer was pretextual. *Id.* A plaintiff shows pretext by establishing the employer is being dishonest. *Id.*; *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("A 'pretext for discrimination' means more than an unusual act; it

-14-

means something worse than a business error; 'pretext' means deceit used to cover one's tracks."). A jury may reasonably infer an employer's proffered reason for a termination is pretextual when it (1) has no basis in fact; (2) did not actually motivate the employer to terminate the employment; or (3) was insufficient to warrant the termination. *See Velasco v. Illinois Dep't of Human Servs.*, 246 F.3d 1010, 1017 (7th Cir. 2001). It is not necessary to determine whether he has established a *prima facie* case if it is clear he cannot show pretext. *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir. 1990). A plaintiff must show pretext in an action under § 1981 of the WFEA as well. *See Currie v. State Dep't of Indus., Labor & Human Relations*, 565 N.W.2d 253, 258 (Wis. Ct. App. 1997).

Here, Anders cannot establish pretext because he cannot show the legitimate, non-discriminatory reasons for his termination proffered by Drephal lacked a basis in fact, did not actually motivate Drephal to terminate him, or were insufficient to warrant his termination. Anders contends Drephal's proffered reasons for his termination lack a factual basis, but this contention is unfounded. Prior to making his decision to terminate Anders' employment, Drephal obtained eye-witness accounts in the form of written and oral reports of how Anders was violent on November 12, 2002, and other occasions. In addition, Snow personally

-15-

informed Drephal that he no longer felt safe around Anders.  Pena, in a written letter and oral statement, recounted how Anders did not do the routes assigned to him on the morning of November 12, 2002, and instead and without permission, went to the north side to confront Drephal.  These eye-witness accounts were sufficient to provide a factual basis for Drephal to conclude Anders was violent and insubordinate.

Anders contends the supervisors' versions of events are exaggerated and erroneous in numerous ways, and he contends Drephal should not have formed conclusions about what actually happened without interviewing him first.  But Drephal explained he did not believe it was necessary to interview Anders because he was unwilling to tolerate a situation where Snow no longer felt safe around Anders and because the eye-witness accounts he received from the supervisors were pretty much consistent.  Under the circumstances, Drephal's business decision to terminate Anders based on the information he had was facially legitimate.  *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (the federal courts are not a super-personnel departments armed with the power to second-guess an employer's facially legitimate business decision).

Anders contends Drephal was not actually motivated to terminate his employment and not rehire him on account of his violent and insubordinate

-16-

behavior because white Waste Management employees engaged in violent and insubordinate behavior and were not terminated. Anders points to Scott Baxter, a former white Waste Management employee who was terminated for putting another employee's head through a wall during a fight in the workplace, but was later was rehired as a result of the CWD acquisition. But Anders fails to show Drephal had anything to do with Baxter's rehiring. In addition, Anders fails to show Baxter ever went after a supervisor and made the supervisor feel unsafe. Thus, Anders cannot compare his behavior to Baxter's, and even if he could, he cannot contend the fact that Baxter was rehired, by itself, reveals anything about Drephal's motivation not to rehire Anders.

Anders next points to Gary Aide, a white Waste Management employee who was not terminated even though he verbally threatened a supervisor. But again, Anders fails to show Drephal had anything to do with disciplining Aide or even knew about Aide's conduct. In addition, Anders fails to show Aide ever aggressively went after a supervisor or had ever been violent on other occasions. Thus, Anders cannot compare his behavior to Aide's, and even if he could, he cannot contend the fact that Aide was not terminated, by itself, reveals anything about Drephal's motivation to terminate Anders.

-17-

Anders contends Drephal was not actually motivated to terminate his employment on account of his failure to perform his work assignment on November 12, 2002, because white Waste Management employees who did not perform their work assignments were not terminated. Anders points to Danny Sie, who allegedly refused to attend a safety meeting, and James Labadie, who allegedly dumped a load of waste in the Waste Management yard. Anders again fails to show Drephal had anything to do with disciplining these workers or was even aware of their behavior. Moreover, Anders is hardly comparable to these employees. After all, there is nothing in the record to suggest these employees had a history of behaving in a violent manner or ever went after a supervisor. Because these employees are not directly comparable to Anders, he cannot point to them to show pretext *Wells*, 289 F.3d at 1007.

Anders, who is a self-described large black man, contends Drephal was actually motivated to terminate his employment because Drephal and his supervisors–especially Snow–harbor an unconscious fear of large black men. There is no evidence to support this contention, and Anders cannot rely on this sort of conclusory assertion about a decisionmaker's racial prejudice to establish pretext. *Wells*, 289 F.3d at 1006-07 (citing *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001)).

-18-

As a final matter, Anders cannot seriously contend the kind of violent and insubordinate behavior in which Drephal concluded he engaged was insufficient to warrant the termination of his employment. After all, Waste Management's rules clearly precluded workplace violence and insubordination. In sum, Anders cannot show pretext, and Waste Management is entitled to summary judgment on Anders' race discrimination claims.

Anders claims Waste Management terminated his employment because he has a disability–namely a panic/anxiety disorder–in violation of the Americans with Disabilities Act ("ADA"). However, Anders cannot establish he is protected by the Act because he fails to show he was a "qualified individual with a disability" at the time of his termination. 42 U.S.C. § 12112(a); *Dvorak v. Mostardi Platt Assocs.*, 289 F.3d 479, 483 (7th Cir. 2002). A qualified individual with a disability is an individual who can "with or without reasonable accommodation . . . perform the essential functions of the employment position that [she] holds or desires." 42 U.S.C. § 12111(8). The Seventh Circuit has made it clear an employee who threatens other employees with violence is *per se* unable to perform the duties of his position:

> The Act does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge–in jeopardy of violating the Act if it fired such an employee, yet

-19-

in jeopardy of being deemed negligent if it retained him and he hurt someone. The Act protects only "qualified" employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one . . . .

It is true that an employer has a statutory duty to make a 'reasonable accommodation' to an employee's disability that is, an adjustment in working conditions to enable the employee to overcome his disability, if the employer can to this without 'undue hardship.' 42 U.S.C. § 12112(b)(5)(A). But we cannot believe that this duty runs in favor of employees who commit or threaten to commit violent acts. The retention of such an employee would cause justifiable anxiety to coworkers and supervisors. It would be unreasonable to demand of the employer either that it force its employees to put up with this or that it station guards to prevent . . . employees from getting out of hand.

*Palmer v. Circuit Court*, 117 F.3d 351, 352-53 (7th Cir. 1997).

Here, Waste Management terminated Anders principally because he was violent in the workplace and made Snow feel unsafe, and as already discussed, there is nothing in the record to suggest Waste Management did not truly believe this to be the case. Under such circumstances, Waste Management was not legally obligated by the ADA to continue Anders' employment after November 12, 2002. *Palmer*, 117 F.3d at 352 ("if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities

-20-

Act").  As such, Waste Management is entitled to summary judgment on Anders'
ADA claims.

Anders claims Waste Management denied him medical leave on
November 6, 2002, and refused to give him such leave after November 12, 2002,
all in violation of the FMLA.  Under the FMLA, an employee is entitled to
12 weeks of leave per year when he is "unable to perform the functions of the
position" because of a "serious health condition."  29 U.S.C. § 2612(a)(1)(D).
Here, Anders fails to show his panic/anxiety disorder–which he contends is a
serious health condition–ever rendered him unable to perform the functions of his
position.  The disorder certainly did not render him unable to perform the duties
of his position prior to November 12, 2002.  After all, Anders regularly reported
to work as scheduled in the weeks and months leading up to that date, and he
takes the position in this lawsuit that his work performance met Waste
Management's legitimate expectations during this time period.  In addition,
Anders fails to show Snow had reason to know he had a serious medical condition
as of November 6, 2002.  After all, Anders did not provide Snow with any medical
documentation to show he has a serious medical condition, and the only
information he imparted to Snow was that he needed to see a doctor because he
was having headaches, trouble sleeping, and was crying all the time.   This

-21-

information, by itself, was insufficient to put Snow on notice that Anders had a serious medical condition within the meaning of the FMLA. *See Collins v. NTN-Bower Corp.*, 272 F.3d 1006, 1008-09 (7th Cir. 2001). But perhaps more to the point, Anders fails to show even *he* had sufficient information to know whether he had a serous medical condition as of November 6, 2002. Anders testified as of that date no doctor told him he needed to take medical leave for any medical reason, and Anders takes the position in this lawsuit that he "could not have foreseen that he would experience a full-blown panic attack" of the sort he experienced on November 12, 2002. (Anders' Brief at 15.) The notion that even Anders did not know he had a serious medical condition as of November 6, 2002, is bolstered by the fact that he never pursued FMLA leave through the formal channels at Waste Management and in his labor union or even tried to learn about how he might go about obtaining leave through these channels. Anders admits he never contacted the human resources department at Waste Management about obtaining leave either before or after he broached the subject with Snow, and he admits he never contacted his union representative or sought permission from his union for a leave of absence as required by the labor agreement. Under the circumstances, Anders cannot show he was wrongfully denied FMLA leave on November 6, 2002.

-22-

Furthermore, Anders cannot contend a serious medical condition rendered him unable to perform the duties of his position on or after November 12, 2002. On the contrary, it was Anders' violent behavior on November 12 and his potential for violent behavior in the future, not his panic-attack disorder, that rendered him unable to perform the functions of his position on and after that date. *See Palmer*, 117 F.3d at 352-53. Like the ADA, the FMLA does not require an employer to retain a potentially violent employee, and it certainly does not require an employer to provide him with medical leave. *Id.* As such, Waste Management is entitled to summary judgment on Anders' FMLA claims.

Finally, Anders claims Waste Management retaliated against him in violation of Title VII by not rehiring him after the acquisition. Anders contends Waste Management retaliated against him because he filed an EEOC complaint 6 months earlier. Title VII makes it unlawful for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Here, Anders fails to show Waste Management's refusal to rehire him was retaliatory. The refusal occurred more than 6 months after Anders filed the EEOC

complaint, and this gap in time is too large to permit an inference that the two events are causally related. *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918-19 (7th Cir. 2000) (3 month gap between filing an EEOC charge and an employer's decision not to rehire does not permit a reasonable inference that the two are causally related). In addition, there is nothing in the record to suggest Drephal's decision not to rehire Anders was causally linked to anything other than his earlier conclusion that Anders was a potentially violent employee. *Oest*, 240 F.3d at 616 (speculation based on timing alone is insufficient to support a reasonable inference of retaliation–an actual causal link must be established). As such, Waste Management is entitled to summary judgment on Anders' retaliation claim.

Accordingly,

IT IS ORDERED that Waste Management's motion for summary judgment (Docket #27) be and the same is hereby GRANTED; and

IT IS FURTHER ORDERED that Anders' claims against the defendants be and the same are hereby DISMISSED with prejudice.

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this __23rd__ day of June, 2005.

BY THE COURT:

_s/ J. P. Stadtmueller_____
J. P. Stadtmueller
U.S. District Judge